[Cite as *WLB Radiology, L.L.C. v. Mercy Health N., L.L.C.*, 2016-Ohio-5276.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

WLB Radiology, LLC, et al.                    Court of Appeals No. L-16-1015

    Appellants                               Trial Court No. CI0201402673

v.

Mercy Health North, LLC, dba
Mercy Radiology Group, et al.                 **DECISION AND JUDGMENT**

    Appellees                                Decided:  August 5, 2016

* * * * *

Brenda A. Ray and Barbara E. Machin, for appellants.

Kris M. Dawley and Robert J. Cochran, for appellees.

* * * * *

**JENSEN, P.J.**

{¶ 1} Plaintiffs-appellants, WLB Radiology, LLC, WLB Interventional, LLC, and Wade L. Banker, M. D., appeal the January 14, 2016 judgment of the Lucas County Court of Common Pleas granting summary judgment in favor of defendants-appellees, Mercy Health North, LLC (dba Mercy Radiology Group) and MRG Associates, LLC. For the reasons that follow we affirm the trial court judgment.

## I. Background

{¶ 2} Wade Banker, M.D. is a radiologist who practices through his professional corporations, WLB Radiology, LLC, and WLB Interventional, LLC (collectively referred to as "Dr. Banker"). On August 1, 2011, Dr. Banker entered into a Professional Services Agreement with Mercy Health System-Northern Region, which previously operated under the name "Mercy Radiology Group," and is now known as Mercy Health North, LLC ("Mercy"). Pursuant to that agreement, Dr. Banker was to provide interventional radiology ("IR") coverage, primarily at St. Anne's Hospital, as well as "limited on-site diagnostic radiology services." The agreement provided for a term of five years, but it was terminable with or without cause with 90 days' notice. On January 7, 2013, Mercy terminated the agreement without cause. It declined to utilize Dr. Banker's services during the 90-day notice period, and instead compensated him $146,954.94 for those three months, which it calculated based on Dr. Banker's average salary for the three months preceding his termination.

{¶ 3} Dr. Banker filed suit on March 5, 2013, against Mercy, MRG Associates, LLC ("MRG"), and Pamela Zipperer-Davis, who, through her company, ZD Management, Inc., served as MRG's chief executive officer. Dr. Banker dismissed the action without prejudice on May 5, 2014. He re-filed on June 3, 2014, and amended his complaint on January 21, 2015. In addition to the defendants named in the first-filed

2.

lawsuit,[1] he also named as defendants ZD Management, Global Versa Radiology, Inc. ("GVR"), Eyal Morag, M.D., and Andrew Rabin, M.D.

{¶ 4} In his amended complaint, Dr. Banker alleged that (1) in violation of their agreement, Mercy stopped compensating him for reading diagnostic studies and for overtime work after March 6, 2012, yet retained the benefit of those services; (2) the failure to compensate him for reading diagnostic studies skewed his average monthly compensation, thereby resulting in an artificially low three-month average from which his compensation was calculated for the 90-day notice period; (3) because he was not permitted to work during the 90-day notice period, he was not properly compensated and patient services were disrupted; (4) following his termination, he retained privileges at all three Toledo-area Mercy Hospitals, yet his access codes were deleted, he was locked out of the facilities, he was denied access to his patient files, and patients, radiology staff, and other health care providers were erroneously informed that he no longer had privileges at the hospitals; (5) this conduct interfered with his relationships with both referral sources and patients; and (6) by prohibiting him from working during the 90-day notice period, Mercy and MRG gained access to his patients and diverted them from him. His amended complaint set forth eight claims:

- Count 1—breach of contract, against Mercy, MRG, and Zipperer-Davis;

- Count 2—unjust enrichment, against Mercy;

---

[1] Initially, Dr. Banker sued "Mercy Health North, LLC, dba Mercy Radiology Group," but corrected this to "Mercy Health System-Northern Region, dba Mercy Radiology Group," in his amended complaint.

3.

- Count 3—breach of contract, against Mercy, MRG, and Zipperer-Davis;

- Count 4—unjust enrichment, against Mercy and MRG;

- Count 5—tortious interference with contract, against Mercy, MRG, and Zipperer-Davis;

- Count 6—tortious interference with business expectations, against Mercy and MRG;

- Count 7—tortious interference with business expectations, against Mercy, MRG, and Dr. Morag; and

- Count 8—tortious interference with contract, against Mercy, MRG, GVR, Dr. Morag, and Dr. Rabin.

{¶ 5} Dr. Banker eventually voluntarily dismissed his claims against Zipperer-Davis, ZD Management, GVR, Dr. Morag, and Dr. Rabin. On August 14, 2015, Mercy and MRG moved for summary judgment on all counts. The trial court granted their motion in an opinion and judgment entry journalized on January 14, 2016. On the same day, it also granted a motion to strike portions of the affidavits of Dr. Banker and Gregory L. Gause, both of which had been submitted by Dr. Banker in opposition to Mercy and MRG's summary judgment motion. Dr. Banker appealed the trial court's judgments and assigns the following errors for our review:

1. The trial court committed prejudicial error in finding there was no breach of the compensation terms of Plaintiff WLB Radiology's contract.

4.

2.  The trial court committed prejudicial error in misapplying the law and in finding no material issues of disputed fact as to whether Defendants interfered with Plaintiffs' current and prospective business relationships.

3.  The trial court committed prejudicial error in striking paragraphs 4, 7 and 10 and Exhibit #7 of the Dr. Banker affidavit.

## II.  Standard of Review

{¶ 6} Appellate review of a summary judgment is de novo, *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996), employing the same standard as trial courts.  *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989).  The motion may be granted only when it is demonstrated:

> (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor.  *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 67, 375 N.E.2d 46 (1978), Civ.R. 56(C).

{¶ 7} When seeking summary judgment, a party must specifically delineate the basis upon which the motion is brought, *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 526 N.E.2d 798 (1988), syllabus, and identify those portions of the record that demonstrate

5.

the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). When a properly supported motion for summary judgment is made, an adverse party may not rest on mere allegations or denials in the pleadings, but must respond with specific facts showing that there is a genuine issue of material fact. Civ.R. 56(E); *Riley v. Montgomery*, 11 Ohio St.3d 75, 79, 463 N.E.2d 1246 (1984). A "material" fact is one which would affect the outcome of the suit under the applicable substantive law. *Russell v. Interim Personnel, Inc.*, 135 Ohio App.3d 301, 304, 733 N.E.2d 1186 (6th Dist.1999); *Needham v. Provident Bank*, 110 Ohio App.3d 817, 826, 675 N.E.2d 514 (8th Dist.1996), citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 201 (1986).

### III. Law and Analysis

{¶ 8} In this appeal, Dr. Banker claims error in the trial court's decision granting summary judgment in favor of Mercy and MRG on his claims for breach of contract and tortious interference with contract and business expectations. He also claims error in the trial court's decision to strike portions of his own affidavit submitted in opposition to Mercy and MRG's motion for summary judgment. We address Dr. Banker's assignments of error out of order.

### A. Dr. Banker's Affidavit Opposing the Summary Judgment Motion

{¶ 9} In opposing Mercy and MRG's motion for summary judgment, Dr. Banker submitted his own affidavit. Mercy and MRG moved to strike portions of Dr. Banker's affidavit, and the trial court granted their motion in part. Dr. Banker claims that the trial

6.

court erred in striking paragraphs 4, 7, and 10 of the affidavit, as well as a document attached to paragraph 10 as Exhibit #7.  The relevant passages provide as follows:

4.  I was told at the time I executed the contract with MRG that my duties and compensation would remain the same.  MRG added a provision for the payment of overtime at $225 an hour, which had been the practice of IA, but was not in writing.

7.  Based on documents received from Defendants, I have been able to determine that between March 6, 2012 and January 7, 2013, I read a total of One Thousand Seven Hundred Twenty (1,720) ct scans for which WLB Radiology was not compensated.  At $40 per ct scan, this totals a $68,800 loss of compensation which was not calculated into the monthly average earnings on which Defendants calculated the last 90 days following notice of termination.

10.  Exhibit #7 is a list of patient files that were removed from the office I shared with other radiologists at Mercy St. Anne's Hospital. Despite my repeated attempts and those of my attorney to locate and retrieve these files so I could follow up with planned patient care, they were not turned over until the deposition of Janet Miller on December 10, 2013, nearly a year later.  Without the list of patients and their referring physician, I was unable to make contact and follow up with their care.

7.

**{¶ 10}** With respect to paragraph 4, the trial court agreed with Mercy and MRG and concluded that the statements were hearsay. It observed that Dr. Banker had failed to argue otherwise. With respect to paragraph 7, the trial court determined that Dr. Banker's assertion that he calculated the number of CT scans he read "based on documents received from Defendants" was insufficient to establish personal knowledge. And with respect to paragraph 10 and Exhibit #7, the court struck that paragraph and exhibit as inadmissible hearsay. It rejected Dr. Banker's argument that Exhibit #7 is excepted from the hearsay rule under Evid.R. 803(5) or 612.

**{¶ 11}** We address each of these paragraphs in turn.

## 1. Paragraph 4

**{¶ 12}** Dr. Banker argues that the trial court erred in striking paragraph 4 because the statements contained in that paragraph were offered not for the truth of the matter asserted, but rather to show Dr. Banker's state of mind in executing the professional services agreement. Mercy and MRG point out that Dr. Banker raises this argument for the first time on appeal and, in any event, Dr. Banker's state of mind is irrelevant because there is no question that the parties had an agreement—the question is whether the trial court properly interpreted the agreement.

**{¶ 13}** As we have often recognized, "[i]t is a cardinal rule of appellate review that a party cannot assert new legal arguments for the first time on appeal." (Internal citations and quotations omitted.) *Murray v. Auto-Owners Ins. Co.*, 2015-Ohio-3295, 40 N.E.3d 679, ¶ 26 (6th Dist.). Having failed to raise this argument in the trial court, Dr. Banker is

8.

barred from asserting it now.  We, therefore, find no error in the trial court's decision to strike paragraph 4 of Dr. Banker's affidavit.

## 2.  Paragraph 7

{¶ 14} With respect to paragraph 7 of the affidavit, Dr. Banker argues that he testified at his August 9, 2013 deposition that he would be able to calculate the number of CT scans he read from data on Mercy's PAC system.  He claims that the data was attached as an exhibit to his December 20, 2013 deposition and that both the August and December 2013 depositions were filed with the court.  He explains that the intent of his statement in paragraph 7 "was to inform the trial court that evidence of the uncompensated ct scans was contained in the record before it and state his lay opinion, pursuant to Evid.R. 701, based on his personal perception of the number of uncompensated ct scan reads encompassed within his claim for breach of contract."

{¶ 15} Mercy and MRG counter that Dr. Banker's affidavit was properly stricken because it failed to incorporate the documents relied upon, failed to identify the documents relied upon, and failed to explain how he arrived at his calculation.  They point us to *TPI Asset Mgmt., LLC v. Conrad-Eiford*, 193 Ohio App.3d 38, 2011-Ohio-1405, 950 N.E.2d 1018, ¶ 24 (2d Dist.), where the court explained:

> [An] affidavit must demonstrate the particular basis on which the affiant gained his understanding of the fact or facts, and that basis must be sufficient to support a finding of fact by the court that the affiant "has personal knowledge of the matter" concerned.  Hearsay knowledge based

9.

on the affiant's review of hearsay business records, for example, is insufficient. (Internal citations omitted.)

{¶ 16} Civ.R. 56(E) provides that "[s]worn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit." Here, not only are the documents relied upon by Dr. Banker *not* attached, they are also not identified. In this way, Dr. Banker's affidavit is flawed in much the same way as the affidavits at issue in *TPI Asset Mgmt*. *See id.* at ¶ 25 ("Even if the * * * affidavits did portray the necessary personal knowledge of the facts contained in [the] affidavits, that would not permit the court to rely on the copies of the documents TPI submitted in support of its motion for summary judgment. The affidavits make no specific reference to those documents."). We find no error in the trial court's decision to strike paragraph 7 of Dr. Banker's affidavit.

### 3. Paragraph 10

{¶ 17} In the trial court, Dr. Banker argued that Exhibit #7, referred to in paragraph 10 of his affidavit, is a recorded recollection under Evid.R. 803(5), or a writing to refresh memory, under Evid.R. 612, thus the hearsay rules do not bar its admission. He now argues, however, that the trial court failed to "consider alternative avenues of evidentiary admissibility." To that end, he claims that Exhibit #7 is admissible as a summary prepared by counsel under Evid.R. 1006. He claims that this document was attached to his affidavit "not to prove the truth of the matter asserted, but to create a summary of the existence of these files and to evidence the number of patients

10.

involved * * *."  Mercy and MRG counter that this argument should be rejected because it is being raised for the first time on appeal, and that even if preserved for appeal, Dr. Banker failed to satisfy the foundational requirements for admission as a summary under Evid.R. 1006.

{¶ 18} Ohio courts recognize that three elements must be satisfied before a summary may be admissible under Evid.R. 1006:  (1) the writings must be voluminous; (2) a proper foundation must be established, including a foundation for the admissibility of the original documents upon which the summary is based; and (3) the originals or duplicates must be made available to all litigants for examination or copying at any reasonable time and place.  *Dellenbach v. Robinson*, 95 Ohio App.3d 358, 375, 642 N.E.2d 638 (10th Dist.1993), citing Weissenberger's Ohio Evidence, 1993 Courtroom Manual, Chapter 1006.  We agree with Mercy and MRG that Dr. Banker failed to raise his Evid.R. 1006 argument in the trial court, and is, therefore, barred from raising it on appeal.  We also agree that he failed to establish a foundation for the admission of the summary contained in Exhibit #7.

{¶ 19} Accordingly, we find no error in the trial court's decision to strike paragraph 10 and Exhibit #7, and we find Dr. Banker's third assignment of error not well-taken.

**Breach of Contract**

{¶ 20} Dr. Banker contends that Mercy and MRG breached the terms of their agreement when they unilaterally stopped paying him for reading CT scans and for

11.

working overtime. Related to this, he claims that they committed a second breach when they calculated his salary for the 90-day notice period using a three-month average that did not include payment for reading CT scans and working overtime. Mercy and MRG counter that (1) the contract expressly provided that Mercy controlled scheduling, and (2) Dr. Banker failed to submit the proper paperwork requesting payment for these services, thus he was not entitled to additional compensation and Mercy appropriately compensated him for the 90-day notice period.

{¶ 21} To prevail on a claim for breach of contract, the plaintiff must demonstrate the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff. *Siemaszko v. FirstEnergy Operating Co. (FENOC)*, 187 Ohio App.3d 437, 2010-Ohio-2121, 932 N.E.2d 414, ¶ 23 (6th Dist.). In construing a written agreement, our objective is to ascertain and give effect to the intent of the parties. *Cont'l Tire N. Am. v. Titan Tire Corp.*, 6th Dist. Williams No. WM-09-010, 2010-Ohio-1355, ¶ 24. We, therefore, begin by examining the relevant provisions of the parties' agreement to determine their respective obligations.

{¶ 22} Section I sets forth Dr. Banker's duties:

    I.  DUTIES OF THE PROVIDER

    1.01  Provision Of Provider Services.

    * * *

    C. *Provider shall provide documentation, on a monthly basis*, on the form attached hereto as Schedule I, or other suitable documentation

acceptable to Mercy, *of the amount of time expended in the performance of these Services hereunder.  Such documentation will be completed and submitted to MHS by or on the tenth (10th) day after the end of each month* and in a form suitable for Medicare, Medicaid and Other third-party agreement cost reimbursement purposes.  *No compensation for these Services will be made by MHS until such documentation has been received.  No compensation for services shall be made by MHS for time logs submitted more than sixty (60) days after the end of the month in which the services were rendered.*

* * *

1.06  *Compensation For Services And Billings/Third-Party Participation.*

* * *

B.  *Payments will be made on a monthly basis within 30 days following the receipt by MHS of the appropriate documentation as outlined in section 1.01.C.  No payment shall be made by MHS unless and until this documentation is provided by Provider.*  Payment shall also be contingent on the timely proper preparation and filing of medical records and reports as set forth in section 1.04.  (Emphasis added.)

**{¶ 23}** Section IV of the contract sets forth the term of the agreement and the parties' rights with respect to termination of the agreement:

IV.  TERM AND TERMINATION

a.  Term.  This Agreement shall commence on August 1, 2011 (the "Effective Date") and subject to section 4.02, shall continue in effect for a period of five years, unless and until terminated in accordance with section 4.02 hereof.

b.  Termination.

A.  *Either party may terminate this Agreement at any time, with or without cause, upon providing not less than ninety (90) days prior written notice to the other party.*  (Emphasis added.)

**{¶ 24}** Section VI prohibited the parties from unilaterally amending the agreement:

VI.  MISCELLANEOUS

6.05  Miscellaneous.  * * * *This Agreement cannot be amended or modified in any respect, unless such amendment or modification is evidenced by a written instrument executed by MHS and Provider.*  The failure by MHS or Provider to exercise any right provided for herein shall not be deemed a waiver of any right hereunder.  (Emphasis added.)

14.

**{¶ 25}** And Exhibit B to the agreement sets forth in greater detail Dr. Banker's duties and the terms of his compensation:

EXHIBIT B

Physician Duties.

- On-site work—Provider is expected to work on-site, *as scheduled by MHS,* normal weekday work hours are between 7:30 am-5:00 pm.

- Schedule will be a minimum of 40 weeks on-site per year, unless additional weeks are agreed to by MHS and provider.

- In addition to providing interventional radiology coverage on site at the Hospital, *Provider will provide limited on-site diagnostic radiology services, by reading diagnostic studies unrelated to Providers interventional radiology procedures as requested by MHS and as time permits.*

- On-call—Provider shall provide weekly interventional radiology call coverage at the Hospital, Monday to Sunday, at least 12 weeks per calendar year (pro-rated for any period less than a full calendar year).

- To the greatest extent practicable, Provider shall provide MHS with reasonable (and, in any event, not less than 8 weeks) advance notice of scheduled time off.

15.

Compensation.

- Weekday On-Site IR Coverage – providers compensation for weekday on call interventional radiology coverage shall be two thousand four hundred dollars ($2,400.00) per day.

- Limited Onsite Diagnostic Services – Provider shall be paid $40 per diagnostic CT study read when providing the above specified limited onsite diagnostic services.

- If physician is requested by MHS (outside of his normal work schedule), diagnostic reading will be compensated at a rate of $225.00 per hour.

- For interventional radiology call coverage, Providers compensation shall be one thousand eight hundred dollars $1,800 per week.

- IR Call Coverage—All compensation shall be payable on a monthly basis within (30) days following the receipt by MHS of the appropriate documentation of services.

    * * * (Emphasis added.)

{¶ 26} For the first seven months after entering into the agreement, Dr. Banker submitted monthly time sheets and was paid for (1) each weekday worked at $2,400 per day; (2) each day he was on call at a prorated amount of $1,800 per week; (3) after-hours and weekend hours at $225 per hour; and (4) each CT read at $40 per CT. For example,

16.

for the period of September 1, 2011, to September 30, 2011, he submitted a time sheet requesting and receiving payment as follows:

- 174 CTs at $40 per CT for a total of $6,960;

- 20 days worked at $2,400 per day for a total of $48,000;

- 11 after-hours reads at $225 per hour for a total of $2,475;

- 9 hours of weekend reads at $225 per hour for a total of $2,025; and

- 4 on call days at $1,800 per week for a total of $1,028.57.

{¶ 27} On March 6, 2012, Dr. Banker sent the following email to Zipperer-Davis,[2] along with language recited from Exhibit B of his contract:

> Pamela,
>
> The below is word for word out of my contract. The second bullet point under compensation states that I can read CT studies at any time at 40 dollars per CT. I have been reading them after 4pm because Deb asked me not to read before 4pm. Out of respect for her and her opinions, I have not been doing that. Nor does this state that I am required to take any diagnostic call.
>
> Wade

---

[2] Dr. Banker characterizes this email as a response to an email from Zipperer-Davis, however, the sequence of emails appears to be Dr. Banker's email, sent Tuesday, March 6, 2012, at 5:00 p.m., then Zipperer-Davis' email, sent Tuesday, March 6, 2012, at 6:24 p.m.

17.

**{¶ 28}** Zipperer-Davis responded that same day as follows:

> Wade, we do not need you to read CTs at all unless you are doing it on days that the IR schedule is light during your 7:30-5:00 pm shift. After February, I will not approve any additional comp for this work.
>
> I will ask Deb to remove you from dx. call. Jeff and I will work on a new agreement with you, that works for both parties, when we finish the dx. contracts.

**{¶ 29}** Dr. Banker stopped submitting payment requests for CTs he read after this date. However, he claims that he continued to read CTs and that radiologists were repeatedly advised by management to "clean up" the list of unread CTs before ending their shifts, thus he continued to read CTs without being paid. Dr. Banker claims that Zipperer-Davis' refusal to approve payment for his reading of CTs constituted a unilateral modification of the terms of his compensation, violating section 6.05 of the parties' contract.

**{¶ 30}** Mercy and MRG claim that under the agreement, Dr. Banker would provide services "as requested," "as assigned," and "as scheduled" by Mercy. They recognize that the agreement could be modified only if agreed to in writing by both parties, and they deny that the March 6, 2012 email from Zipperer-Davis was a unilateral modification of the agreement. They instead describe it as an exercise of Mercy's discretion to request, assign, and schedule Dr. Banker's services. They also maintain that

18.

Dr. Banker failed to document the CT readings or submit paperwork requesting payment for those services as required under sections 1.01(C) and 1.06(B) of the agreement.

{¶ 31} The trial court agreed with Mercy and MRG that the March 6, 2012 Zipperer-Davis email was not a unilateral modification of the agreement and that the terms of the agreement made clear that Dr. Banker was to read diagnostic studies only as requested by Mercy, only as time permitted, and only if Dr. Banker submitted the required documentation. It held that there was no evidence that Mercy requested him to read CTs after March of 2012, or that Dr. Banker submitted the appropriate documentation, thus Mercy did not breach the contract by failing to compensate Dr. Banker for these services.

{¶ 32} With respect to payment following notice of Mercy's termination of the agreement, the court held that Mercy and MRG did not breach the agreement by failing to include CTs read and overtime worked in calculating Dr. Banker's salary during the 90-day notice period. It reasoned that (1) "there is no provision within the Contract that requires a specific method for payment of Dr. Banker after his termination notice has been issued," and (2) "there is no documentation submitted by Dr. Banker as to the overtime hours worked or CT scans read that could allow defendants to factor that time into their payment calculation."

{¶ 33} Whether or not Dr. Banker continued to read CTs after March 6, 2012, we agree with the trial court that there is no evidence that he submitted the documentation required under 1.01(C) of the parties' agreement. Section 1.01(C) plainly states that

19.

"*[n]o compensation for services shall be made by MHS for time logs submitted more than sixty (60) days after the end of the month in which the services were rendered.*" (Emphasis added.) Dr. Banker failed to submit any such logs despite his insistence that he was entitled to compensation under the terms of the agreement.

{¶ 34} Dr. Banker argues that under section 6.05 of the agreement, "the failure by MHS or Provider to exercise any right provided for herein shall not be deemed a waiver of any right hereunder." However, the right to payment for services rendered under the agreement was expressly conditioned on Dr. Banker submitting the required paperwork. Dr. Banker knew that under the terms of the agreement, he was under a duty to submit time logs within 60 days of the end of the month during which services were rendered. If he believed that he was entitled to payment for each CT he read, it was incumbent on him to submit the required paperwork.

{¶ 35} We acknowledge that a list of approximately 20 recipients received an email from Mark Reinhard, MRG's practice administrator, dated January 3, 2013, reminding them to "make sure the que is cleaned up" before leaving every day. There is also an email dated May 22, 2012, from Zipperer-Davis to 12 radiologists attaching a shift log of unread studies at each of Mercy's three area hospitals. But there was no evidence presented that Dr. Banker, in particular, was requested to review CTs and, in fact, he was specifically instructed *not* to read CTs "at all" unless the IR schedule during his shift was light.

20.

{¶ 36} We also acknowledge that Dr. Banker requested during discovery and received from Mercy a log that would enable him to determine the number of CTs he read in 2012. By that time, however, the 60-day period for submitting time sheets had long passed and Dr. Banker was unable to perform under the agreement. Accordingly, we find no error in the trial court's conclusion that Mercy and MRG did not breach the agreement with Dr. Banker. Related to this, we find no breach by Mercy or MRG in failing to factor CTs read by Dr. Banker in 2012 in calculating his compensation for the 90-day notice period.

{¶ 37} Accordingly, we find Dr. Banker's first assignment of error not well-taken.

**C. Interference With Current and Prospective Business Relationships**

{¶ 38} Dr. Banker contends that Mercy and MRG tortiously interfered with his contracts and business relationships with both patients and referral sources. In his second assignment of error, he claims that the trial court ignored relevant case law and incorrectly determined that there existed no genuine issue of material fact with respect to these claims.

{¶ 39} "The torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14, 651 N.E.2d 1283 (1995). A claim for tortious interference with a contract requires proof of (1) the

21.

existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages.  (Citations omitted.)  *Ginn v. Stonecreek Dental Care*, 2015-Ohio-1600, 30 N.E.3d 1034, ¶ 12 (12th Dist.).  A claim for a tortious interference with a business relationship requires proof of (1) the existence of a business relationship; (2) the wrongdoer's knowledge of the relationship; (3) an intentional interference causing a breach or termination of the relationship; and (4) resulting damages.  (Citations omitted.)  *Id.* at ¶ 11.

{¶ 40} "The main distinction between tortious interference with a contractual relationship and tortious interference with a business relationship is that interference with a business relationship includes intentional interference with prospective contractual relations not yet reduced to a contract."  *Diamond Wine & Spirits, Inc. v. Dayton Heidelberg Distrib. Co., Inc.*, 148 Ohio App.3d 596, 604, 2002-Ohio-3932, 774 N.E.2d 775, ¶ 23 (3d Dist.).  Ohio courts have recognized that tortious interference with a business relationship is applicable to terminable-at-will contracts.  *Lapping v. HM Health Servs.*, 11th Dist. Trumbull No. 2000-T-006, 2001 Ohio App. LEXIS 5634, *24 (Dec. 14, 2001).  A patient-physician relationship is one that it is terminable at-will.  Significantly, Ohio does not recognize the tort of negligent interference with a contract or business relationship.  *MedCorp, Inc. v. Mercy Health Partners,* 6th Dist. Lucas No. L-08-1227, 2009-Ohio-988, ¶ 17.

22.

{¶ 41} We address Dr. Banker's claims with respect to both his patients and referral sources.

### 1. Relationships with Patients

{¶ 42} With respect to his contracts with patients, Dr. Banker claims that by terminating him immediately without allowing him to work during the 90-day notice period, Mercy and MRG prevented him from providing follow-up care to his patients, many of whom had been referred to him from outside Mercy. He claims that his access codes were deleted despite the fact that he maintained privileges at all three Toledo-area Mercy hospitals, and his handwritten patient treatment notes were removed from his office. Dr. Banker also contends that the radiology staff was told that he no longer worked at St. Anne's Hospital, did not maintain privileges, and could not be scheduled for procedures there.

{¶ 43} Mercy and MRG counter that (1) Dr. Banker failed to identify any patients with whom he had contracts, and (2) there is no evidence that Mercy or MRG *intentionally* refused to allow Dr. Banker access to Mercy facilities or that they told patients that he no longer worked at or could perform procedures at Mercy. Any assertion to that effect, Mercy and MRG insist, is based on inadmissible hearsay statements.

{¶ 44} The trial court agreed with Mercy and MRG that Dr. Banker failed to identify any specific physician-patient relationship that they had interfered with, or that they had *intentionally* interfered with any such relationship.

23.

{¶ 45} As an initial matter, Dr. Banker argues that the trial court applied cases that arose in a commercial setting, and, therefore, failed to take into account the unique attributes of the physician-patient relationship. He urges us to consider the Second District's decision in *Shah v. Cardiology South, Inc.*, 2d Dist. Montgomery No. 20440, 2005-Ohio-211, because it recognizes the trust and confidence associated with the physician-patient relationship and the wrongfulness of a medical corporation's refusal to allow a physician access to his patients' records or to provide the physician's contact information to patients.

{¶ 46} In *Shah*, the physician-plaintiff bought shares in the defendant-cardiology group and entered into an agreement whereby he would provide nuclear reading services to the group, thereby allowing the group to avoid referring those services elsewhere. The physician eventually separated from the group. He brought several claims against it, including a claim for tortious interference with business relationships. He alleged that the group refused to tell patients how they could contact him, provided misinformation to patients, and refused to transfer patient files to him. The physician argued that this caused him to lose patients. The group maintained that the patients belonged to the referring physician within the group.

{¶ 47} The trial court concluded that the physician failed to show that he lost clients as a direct result of a wrongful act by the group, and it determined that the group had an "equal right to compete with [the physician] for business from patients." While the appellate court agreed with the trial court that the physician-patient relationship is a

24.

business interest, it differentiated that relationship from a typical business relationship because of the trust and confidence that exists between a physician and patient. It concluded that the group was "not privileged to deny information about its former physician/employee's whereabouts to patients he treated while he was an employee," and that it also was not "privileged to refuse to forward medical records concerning care administered to the patient by the physician while he was an employee." However, because the physician had been unable to offer any evidence showing "who those persons were or what their care that was lost to him might have involved," it concluded that the trial court properly granted summary judgment in favor of the group on the physician's tortious interference claims.

{¶ 48} Dr. Banker argues that at his depositions, he provided a few names of patients with whom he had relationships, and that paragraph 10 and Exhibit #7 of his affidavit in support of his summary judgment motion, listing the names of patients whose files were removed from his office, identified additional patients. He insists that these are the individuals with whom he had established patient-physician relationships, and until defense counsel relinquished the files, he had been unable to recall their names. He maintains that without his files, he had no means of contacting these patients or their referring physicians or of determining what follow-up care was necessary.[3]

---

[3] Interestingly, the names of the patients identified at Dr. Banker's depositions do not appear in Exhibit #7.

25.

**{¶ 49}** There are several problems with Dr. Banker's claims. For one, the court struck paragraph 10 and Exhibit #7, and as we have already articulated, the court did not err in doing so. In addition, Dr. Banker failed to offer admissible evidence that any particular patient or referral source was misinformed as to his ability to practice or was denied his contact information. Although Dr. Banker relies on *Shah,* like the physician in that case, he failed to present evidence showing what care was lost to him despite having been provided with his patient notes before responding to Mercy and MRG's motion for summary judgment. *See also Sickle-Santanello v. Ohiohealth Corp.*, Franklin C.P. No. 10 CV 17393, 2013 Ohio Misc. LEXIS 9348, *19 (May 31, 2013) ("General allegations of interference without presenting evidence of actual patients lost as a proximate result of the actions of the defendant are insufficient to withstand summary judgment."). We also note that the parties' agreement specifically stated at section 1.04(A) that "all medical records prepared by Provider pursuant to this Agreement are the property of MHS and the original records may not be removed from MHS." This would appear to apply regardless of whether the referral originated inside or outside the Mercy system. There is no evidence that any request for medical records properly authorized by a patient was denied. Thus, we find nothing improper with respect to Mercy and MRG removing patient treatment notes from Dr. Banker's office.

**{¶ 50}** Turning to alleged misinformation provided to patients, Dr. Banker claims that the deposition of Karen Miller, manager of the radiology department at St. Anne's Hospital, and Lori Parker, the nursing team leader for the IR department, establish that

26.

misinformation was provided concerning Dr. Banker's ability to see patients. Miller testified that she initially assumed that Dr. Banker could no longer perform procedures because that had been the case when other radiologists had been terminated. She told the staff that Dr. Banker had been terminated, but told them that if anyone called to schedule an appointment with him, they should forward the calls to scheduling or to the medical staff office and they could contact Dr. Banker. Parker testified that Miller told her that Dr. Banker no longer had privileges to practice at the hospital. She said that on "a couple instances" she told patients that he no longer practiced there, but in those cases, she notified the scheduler so Dr. Banker could be contacted. Parker said that she was told that she could not schedule procedures with Dr. Banker, but he resumed performing procedures within a couple months after he was terminated.

{¶ 51} Mercy and MRG point out that Miller's misunderstanding of Dr. Banker's ability to practice at the hospital existed for a very short period of time. They also emphasize that Miller testified that (1) she did not communicate this to any patients, and (2) she instructed radiology staff that any calls about patients wanting to schedule appointments with Dr. Banker should be referred to Mercy's medical staff office.

{¶ 52} As explained, Ohio does not recognize a claim for negligent interference with business relationships. Here, Miller incorrectly informed radiology staff that Dr. Banker could no longer practice at the hospital based on a faulty assumption that his situation was similar to that of radiologists who had been terminated in the past. There is no evidence that her conduct was motivated by any intent to interfere with Dr. Banker's

27.

contracts or business relationships. At most, Miller's conduct was negligent. The same is true with respect to Parker.

{¶ 53} We, therefore, find that Dr. Banker failed to create a genuine issue of material fact with respect to his claims that Mercy and MRG tortiously interfered with his contracts and relationships with patients.

### 2. Relationships with Referral Sources

{¶ 54} Turning to Dr. Banker's relationships with referral sources and other medical providers, Dr. Banker believes that physicians and outside medical providers were told that they could not schedule procedures specifically with him and that patients would be treated by whichever MRG radiologist was scheduled to work. He describes that his ability to provide radiological services was "brought to a standstill" by Mercy and MRG's interference with his current and prospective patient and physician relationships. He maintains that the testimony of Karen Werdehoff, the nursing director at Regency Hospital (nka Sylvania Center) ("Regency"), a skilled nursing facility, validates his position that Mercy and MRG interfered with his attempts to obtain referrals. Dr. Banker also claims that St. Anne's president, Brad Bertke, told oncologists and ER physicians that they were to refer patients first to MRG, and only if MRG could not meet their needs should they refer patients to Dr. Banker.

{¶ 55} Mercy and MRG maintain that the only third-party referral source Dr. Banker identified was Regency. They claim that there is no evidence that they were aware of any business relationship between Dr. Banker and Regency, or that they

28.

interfered with this relationship. They insist that the only evidence cited by Dr. Banker is based on inadmissible hearsay.

{¶ 56} The trial court agreed that the only business relationship that Dr. Banker identified was with Regency. It held that Dr. Banker failed to establish that Mercy or MRG was aware of the relationship or had interfered with it.

{¶ 57} Werdehoff testified that her facility had been interested in utilizing Dr. Banker's services. She said that her staff was advised of a plan to schedule procedures with Dr. Banker, but "the reports coming back to [her] from floor staff or nurse managers would be that they were unable to schedule with Dr. Banker, and it usually was just different reasons." She said that it was reported to her that when they called the IR department, they were told that they could not schedule with a physician that way and would have to contact central scheduling, or they were told that they could not guarantee which doctor they would get or when they could get an appointment. Werdehoff said she tried to schedule a patient once herself but was told that they were having technical difficulties and the computers were down. She could not identify who she spoke to or which department she called.

{¶ 58} Werdehoff's testimony does not support Dr. Banker's claim. Her testimony with respect to what other nursing staff was told by unidentified Mercy personnel is inadmissible hearsay. And there is no evidence indicating that the response she received during her single call to Mercy was untrue or was made with the intent to interfere with Dr. Banker's relationship with Regency.

29.

**{¶ 59}** Dr. Banker also claims that emergency room physicians and oncologists were misinformed as to his ability to practice at the hospitals. Again, this assertion relies upon hearsay evidence. He presented no admissible evidence that his potential referral sources were told that he could no longer perform procedures. At his deposition, Bertke acknowledged that on a couple of occasions, he told inquiring physicians that Dr. Banker was available for referrals and that "if you feel that you need to use his services, you should use his services." He expressed that he hoped that the physicians could use MRG, but told them that if they did not think the group was meeting their needs, they were able to use Dr. Banker. We do not agree with Dr. Banker that this statement rises to the level of a tortious interference with his business relationships.

**{¶ 60}** Accordingly, we find Dr. Banker's second assignment of error not well-taken.

### Conclusion

**{¶ 61}** For the foregoing reasons, we find Dr. Banker's three assignments of error not well-taken, and we affirm the January 14, 2016 judgment of the Lucas County Court of Common Pleas granting summary judgment in favor of Mercy and MRG. The costs of this appeal are assessed to Dr. Banker in accordance with App.R. 24.

Judgment affirmed.

30.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.

Stephen A. Yarbrough, J.

James D. Jensen, P.J.
CONCUR.

_____
                    JUDGE

_____
                    JUDGE

_____
                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.